# Exhibit A

Formulario OAT 1721
(Rev. Agosto 2023)

Estado Libre Asociado de Puerto Rico
TRIBUNAL GENERAL DE JUSTICIA
**Tribunal de Primera Instancia**
Sala ☒ Superior ☐ Municipal de San J ua

| | |
|---|---|
| LDG MEDICAL SERVICES GROUP LLC Y OTROS | Caso Núm. SJ2023CV08437 |
| Parte Demandante | |
| v. | Salón Núm. 903 |
| ELI LILLY AND COMPANY Y OTROS | ENRIQUECIMIENTO INJUSTO |
| Parte Demandada | Acción Civil de: Materia o Asunto |

**EMPLAZAMIENTO**

ESTADOS UNIDOS DE AMERICA, SS
EL PRESIDENTE DE LOS ESTADOS UNIDOS
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO

A: CAREMARK PUERTO RICO. LLC

Nombre de la parte demandada que se emplaza

403 MUÑOZ RIVERA AVE
SAN JUAN, PR 00918

Dirección de la parte demandada que se emplaza

POR LA PRESENTE se le emplaza para que presente al tribunal su alegación responsiva dentro de los ____30____ días de haber sido diligenciado este emplazamiento, excluyéndose el día del diligenciamiento. Usted deberá presentar su alegación responsiva a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC), al cual puede acceder utilizando la siguiente dirección electrónica: https://www.poderjudicial.pr/index.php/tribunal-electronico/, salvo que el caso sea de un expediente físico o que se represente por derecho propio, en cuyo caso deberá presentar su alegación responsiva en la Secretaría del Tribunal y notificar copia de la misma al (a la) abogado(a) de la parte demandante o a ésta, de no tener representación legal. Si usted deja de presentar su alegación responsiva dentro del referido término, el tribunal podrá dictar sentencia en rebeldía en su contra y conceder el remedio solicitado en la demanda, o cualquier otro, si el tribunal, en el ejercicio de su sana discreción, lo entiende procedente. Además, se le apercibe que, en los casos al amparo de la Ley Núm. 57-2023, titulada *Ley para la Prevención del Maltrato, Preservación de la Unidad Familiar y para la Seguridad, Bienestar y Protección de los Menores*, entre los remedios que el Tribunal podrá conceder se incluyen la ubicación permanente de un (una) menor fuera de su hogar, el inicio de procesos para la privación de patria potestad, y cualquier otra medida en el mejor interés del (de la) menor. *(Artículo 33, incisos b y f de la Ley Núm. 57-2023)*. Se le advierte de su derecho a comparecer acompañado(a) de abogado(a) en los casos que proceda.

HAROLD D. VICENTE COLON

Nombre del (de la) abogado(a) de la parte demandante,
o de la parte, si no tiene representación legal

11,303

Número ante el Tribunal Supremo (RUA), si es abogado(a)

PO BOX 11609
SAN JUAN, PR 00910-1609

Dirección

(787)751-8000 / (787)756-5250

Número de teléfono; número de fax

hdvc@vclawpr.com

Correo electrónico

Expedido bajo mi firma y sello del Tribunal, el _____ de SEP 0 8 2023 de _____ .

GRISELLE RODRIGUEZ COLLADO
SECRETARIA REGIONAL

Nombre del (de la)
Secretario(a) Regional

Por: _Mildred G. Franco Gonzalez_
Nombre del (de la)
Secretario(a) Auxiliar del Tribunal

Firma del (de la)
Secretario(a) Auxiliar del Tribunal

Formulario OAT 1721
(Rev. Agosto 2023)

Página 2 de 3

Caso Núm. SJ2023CV08437

## CERTIFICADO DE DILIGENCIAMIENTO POR EL (LA) ALGUACIL

Yo, _____ Alguacil del Tribunal de Primera Instancia de Puerto
Rico, Sala de _____ .

CERTIFICO que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue
realizada por mi, el _____ de _____ de _____, a las _____ ☐ a.m. ☐ p.m., de la
siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:

_____

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física:

_____

☐ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada o
designada por ley para recibir emplazamientos en la siguiente dirección física:

_____

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:

_____
_____

En _____ , Puerto Rico, el _____ de _____ de _____ .

_____
Nombre del (de la) Alguacil Regional

_____
Nombre del (de la) Alguacil de Primera Instancia
y Número de Placa

_____
Firma del (de la) Alguacil de Primera Instancia

## DILIGENCIAMIENTO DEL EMPLAZAMIENTO POR PERSONA PARTICULAR

Yo, Alberto Kolor Ortiz, declaro tener capacidad legal conforme la Regla 4.3
de Procedimiento Civil de Puerto Rico, y certifico que el diligenciamiento del emplazamiento y de la
demanda del caso de referencia fue realizado por mi, el 14 de Septembre de 2023
de la siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:

_____

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física:

CRB MURK PRLLC

☑ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demanda o
designada por ley para recibir emplazamientos en la siguiente dirección física:
405 Ave. Muñoz Rivers 4 Junbic . Tacaueline Vargas
(Directora Rec. Humanos)

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:

_____

COSTOS DEL DILIGENCIAMIENTO: $ _____

## DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que
la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.

Y PARA QUE ASÍ CONSTE, suscribo la presente en _____ , Puerto Rico, el _____
de _____ de _____

_____
Firma del (de la) emplazador(a)

_____
Dirección del (de la) emplazador(a)

AFFIDÁVIT NÚM. _____ [en caso de ser juramentado ante un(a) notario(a)]

Jurado(a) y suscrito(a) ante mi por _____ ,
de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer

(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)

En _____ , Puerto Rico, el _____ de _____ de _____ .

Por: _____

_____
Nombre del (de la) Notario(a) o
Secretario(a) Regional

_____
Nombre del (de la)
Secretario(a) Auxiliar del Tribunal

_____
Firma del (de la)
Secretario(a) Auxiliar del Tribunal

Caso Núm. SJ2023CV08437_____

## DILIGENCIAMIENTO BAJO LEY NÚM. 57-2023

Yo, _____, certifico que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue realizado por mí, el ____ de _____ de _____ , de la siguiente forma:

☐ Mediante envío a la parte demandada por correo electrónico a la siguiente dirección:

_____

☐ Mediante envío a la parte demandada por correo regular a la siguiente dirección:

_____

## DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.

Y PARA QUE ASÍ CONSTE, suscribo la presente en _____ , Puerto Rico, el _____ de _____ de _____ .

_____          _____
Firma del (de la) emplazador(a)                      Dirección del (de la) emplazador(a)

AFFIDÁVIT NÚM. _____ [en caso de ser juramentado ante un(a) notario(a)]

Jurado(a) y suscrito(a) ante mí por _____ , de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer

(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)

En _____ , Puerto Rico, el _____ de _____ de _____ .

                                                    Por: _____

_____          _____
Nombre del (de la) Notario(a) o                     Nombre del (de la)
Secretario(a) Regional                               Secretario(a) Auxiliar del Tribunal

                                                    _____
                                                    Firma del (de la)
                                                    Secretario(a) Auxiliar del Tribunal

THE GOVERNMENT OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR COURT, SAN JUAN PART

| | |
|---|---|
| **LDG MEDICAL SERVICES GROUP L.L.C.; INTEGRITY MEDICAL GROUP, CORP.; INSTITUTO MEDICO FAMILIAR INC.; INSTITUTO MEDICO FAMILIAR DEL ESTE INC.; SALUD 2011, INC.; MENR MEDICAL SERVICES CORP.; NRMD HEALTH PROVIDER LLC; CENTRO MEDICO SALINAS, INC.; BEST HEALTH GROUP, LLC; EAST BEST HEALTH, LLC; G.M.D.C. INC., and GRUPO MEDICO DE CAYEY LLC**<br><br>Plaintiffs,<br><br>v.<br><br>**ELI LILLY AND COMPANY; ELI LILLY EXPORT S.A.; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; SANOFI-AVENTIS PUERTO RICO, INC.; EXPRESS SCRIPTS, INC.; CAREMARKPCS HEALTH, LLC; CAREMARK PUERTO RICO LLC; and OPTUMRX INC.,**<br><br>Defendants | Case No. 5J 2023CV08437 |

## COMPLAINT

1. Plaintiffs LDG Medical Services Group, L.L.C. ("LDG"), Integrity Medical Group, Corp. ("IMG"), Instituto Medico Familiar Inc. ("IMF Inc."), Instituto Medico Familiar del Este Inc. ("IMF Este"), Salud 2011, Inc. ("Salud"), MENR Medical Services Corp. ("MENR"), NRMD Health Provider LLC ("NRMD"), Centro Medico Salinas, Inc. ("CMS"), Best Health Group, LLC ("BHG"), East Best Health, LLC ("EBH"), G.M.D.C. Inc. ("G.M.D.C."), and Grupo Medico de Cayey LLC ("Grupo Medico") bring this action pursuant to, *inter alia*, the Puerto Rico Antitrust Act (the "PRAA"), 10 L.P.R.A. §§ 258, 260, 268, *et seq.*, to redress Defendants' anticompetitive, unlawful conduct and unlawful misrepresentation and suppression of accurate pricing information in connection with the manufacture and sale of insulin products in Puerto Rico. As alleged further below, Defendants Eli Lilly and Company ("Eli Lilly & Co."), Eli Lilly Export S.A. ("Eli Lilly Export"), Novo Nordisk Inc. ("Novo Nordisk"), Sanofi-Aventis U.S. L.L.C. ("Sanofi U.S."), and Sanofi-Aventis Puerto Rico, Inc. ("Sanofi-PR") (collectively with Eli Lilly & Co., Eli Lilly Export, Novo Nordisk, and Sanofi U.S., the "Manufacturing Defendants") have engaged in horizontal

1

price-fixing and/or other unlawful combinations or agreements in restraint of trade with respect to their benchmark prices for the analog insulin products they produce. Similarly, Defendants Express Scripts, Inc. ("Express Scripts"), CareMarkPCS Health, L.L.C., CareMark Puerto Rico L.L.C. ("CareMark-PR"), and OptumRX Inc. ("OptumRX") (collectively with Express Scripts, CareMarkPCS Health, L.L.C., and CareMark-PR, the "PBM Defendants") have engaged in horizontal price-fixing and/or other unlawful combinations or agreements in restraint of trade by exerting leverage against each of the Manufacturing Defendants to provide similar "rebates" off the benchmark price for the Manufacturing Defendants' analog insulin prices to increase artificially the PBM Defendants' profits. Moreover, the Manufacturer Defendants and PBM Defendants have worked together to fix prices for analog insulin in Puerto Rico through (1) agreeing on high rebates that benefit the PBMs, that (2) are passed on largely to consumers and (as pertinent here) independent physicians associations ("IPAs")—Plaintiffs, included—that pay prices based on the artificially inflated benchmark prices. Each of these combinations—of the Manufacturing Defendants, of the PBM Defendants, and of the Manufacturing Defendants with the PBM Defendants together—is a violation of the PRAA and other Puerto Rican laws for which Plaintiffs, as IPAs, are entitled to recover damages. All the while, Defendants represented that the price increases were justified and that the Defendants lacked the ability to control those prices, each in violation of Puerto Rican law and in furtherance of the insulin pricing scheme.

## INTRODUCTION

2.      Diabetes is a leading cause of death in Puerto Rico, and many of the nearly 500,000 Puerto Ricans who suffer from the condition depend on insulin to survive.

3.      Though insulin is nearly a century old and has been widely prescribed for decades, the price of this life-sustaining drug has skyrocketed in recent years, and it has done so exclusively in the United States markets (including Puerto Rico). In 2018, the cost for a vial of insulin averaged $98.70 in the United States, but only $6.94 in Australia, $7.52 in the United Kingdom, $9.08 in France, $11.00 in Germany, $12.00 in Canada, and $14.40 in Japan. Eli Lilly's Humalog, for example, sells for more than $300 in the United States, but costs only $30 in Canada. The price of insulin in the United States is, therefore, nearly ten-fold its price in the rest of the developed world.

4.      The staggering price differential of insulin in the United States (and specifically in Puerto Rico) is no accident, nor is it the product of legitimate market forces. Defendants have

2

wielded their immense market power to artificially inflate the price of insulin in the United States (and specifically in Puerto Rico) in violation of the PRAA and other Puerto Rico laws.

5. The Manufacturing Defendants manufacture nearly all insulin sold in the United States. The Manufacturing Defendants abuse their oligopolistic power to aggressively raise the list price of insulin in lockstep with one another, while representing to the public that such price increases are justified by market forces and/or otherwise beyond the Defendants' control. These price increases have exceedingly outpaced inflation and cannot be attributed to either improvements in the efficacy of the drugs or the cost of manufacturing them.

6. The PBM Defendants are pharmacy benefit managers ("PBMs") that administer prescription drug programs and, in doing so, determine which prescription drugs are included on their drug "formularies," setting forth the drugs that are covered by the drug plans they administer and, if so, at what price to the consumer (in the form of co-payments and other cost-sharing obligations). The PBM Defendants dominate the PBM market in the United States (including Puerto Rico), holding more than 75% of the market share, and inclusion of a prescription drug by the PBM Defendants on their drug formularies drives sales volume and revenue to the Manufacturing Defendants. The PBM Defendants leverage that market power in negotiating secret rebates that a Manufacturing Defendant will pay to the PBM Defendants—not individual consumers or IPAs—if an individual consumer fills a prescription for a drug manufactured by the Manufacturing Defendants.

7. These secret rebates lead to perverse incentives. PBMs, which purport to exist for the purpose of lowering drug prices, actually pressure manufacturers like the Manufacturing Defendants into providing higher rebates in exchange for preferred placement on the PBMs' drug formularies (lists specifying drugs that can be purchased by individual consumers, and at what level of copay or coinsurance, in connection with a particular plan for which the PBM is acting). The Manufacturing Defendants in turn leverage their unchecked market power to increase the benchmark price of their analog insulin products to make up for the higher rebates. And all along, individual consumers—through co-payment and other cost-sharing obligations—and IPAs—through paying the balance of the listed price, after deducting the consumer's co-pay or other shared amount—are paying amounts premised on the artificially inflated benchmark prices.

8. In Puerto Rico, the effects of these artificially inflated and concerted prices are felt most by IPAs like Plaintiffs. The business models of IPAs like Plaintiffs are structured such that

3

each IPA receives a set amount of money per beneficiary for a specific period of time (e.g., a quarterly period) that is referred to as a "capitation payment." The IPA then provides services on behalf of its beneficiaries, including (as pertinent here) payment to pharmacies for prescription drugs obtained by the IPA's beneficiaries. Each dollar spent by the IPA on benefits for its beneficiaries is deducted from the IPA's capitation payments. At the end of the specified period (e.g., the end of a fiscal quarter), the IPA either retains a portion of the remaining capitation as profit or, in the event the cost of benefits during that period exceeds the amount received as a capitation payment, bears a portion of the losses. The artificially inflated pricing for analog insulin set forth herein has "squeezed" capitation payments to Plaintiffs: the profits to which the Plaintiffs might otherwise have been entitled have been diminished, and the losses the Plaintiffs have been required to bear have increased, all because of the higher price of analog insulin. Plaintiffs are the end-purchasers of the analog insulin products and thus bear the burden of the artificially inflated prices themselves, without passing on those amounts to any other entity or person in the insulin distribution chain. Each Plaintiff has accordingly incurred hundreds of thousands (and potentially millions) of dollars in damages from its purchase of each analog insulin product manufactured by the Manufacturing Defendants.

9.      Critically, the amounts paid by IPAs (like Plaintiffs) for analog insulin on behalf of their beneficiaries are calculated based on the benchmark pricing set by the manufacturers; IPAs do not share in the large rebates received by PBMs from manufacturers.

10.      In sum, and as set forth more fully below, (1) the PBMs and Manufacturing Defendants work together to increase the rebates paid to PBMs in exchange for more-favorable placement on the PBM Defendants' drug formularies; (2) as price-setting, oligopolistic firms, the Manufacturing Defendants are able to increase and maintain (and have increased and maintained) their prices to inflate their profits, while incorporating the higher rebates paid to the PBM Defendants; and (3) the higher prices charged by the Manufacturing Defendants are then passed on to the IPAs, including Plaintiffs, which are required to bear the ultimate economic burden of the artificially inflated prices through the detrimental effect on their capitation payments. Plaintiffs seek to recover all damages to which they are entitled as a result of Defendants' unlawful, anticompetitive conduct.

4

## PARTIES

11.      Each Plaintiff is an IPA. IPAs are businesses comprised of a network of physicians who, through the combined efforts of the physicians in each IPA, are able to provide a diverse array of services to their beneficiaries.

12.      Plaintiff LDG is a limited liability company organized under the laws of Puerto Rico with its main office located in San Juan, PR.

13.      Plaintiff IMG is a corporation organized under the laws of Puerto Rico with its main office located in Isabela, PR.

14.      Plaintiff IMF Inc. is a corporation organized under the laws of Puerto Rico with its main office located in Canovanas, PR.

15.      Plaintiff IMF Este is a professional corporation organized under the laws of Puerto Rico with its main office located in Canovanas, PR.

16.      Plaintiff Salud is a corporation organized under the laws of Puerto Rico with its main office located in San Juan, PR.

17.      Plaintiff MENR is a corporation organized under the laws of Puerto Rico with its main office located in San Juan, PR.

18.      Plaintiff NRMD is a limited liability company organized under the laws of Puerto Rico with its main office located in San Juan, PR.

19.      Plaintiff CMS is a corporation organized under the laws of Puerto Rico with its main office located in Salinas, PR.

20.      Plaintiff BHG is a limited liability company organized under the laws of Puerto Rico with its main office located in San Juan, PR.

21.      Plaintiff EBH is a limited liability company organized under the laws of Puerto Rico with its main office in San Juan, PR.

22.      Plaintiff G.M.D.C. is a corporation organized under the laws of Puerto Rico with its main office located in San Juan, PR.

23.      Plaintiff Grupo Medico is a limited liability company organized under the laws of Puerto Rico with its main office located in San Juan, PR.

24.      Defendant Eli Lilly & Co. manufactures, promotes, and sells several analog insulin medications, including Humulin N, Humulin R, Humalog, and Basaglar, all of which are provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the

5

Plaintiffs for their beneficiaries. Each Plaintiff has purchased and/or paid for at least one of the analog insulin products manufactured by Eli Lilly & Co. Moreover, Eli Lilly & Co. employs sales representatives in Puerto Rico to promote and sell insulin products. Eli Lilly & Co. also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico. Eli Lilly & Co. is an Indiana corporation with its principal place of business in Indiana.

25.     Defendant Eli Lilly Export is Defendant Eli Lilly & Co.'s affiliate in Puerto Rico. Eli Lilly Export is a Puerto Rico corporation that has, upon information and belief, spent at least hundreds of thousands of dollars from 2015 to 2023 to market Defendant Eli Lilly & Co.'s products, including insulin products, to physicians in Puerto Rico (including the physicians who comprise the networks for Plaintiffs). Upon information and belief, Eli Lilly & Co. and Eli Lilly Export operate as a single economic unit pursuant to which Eli Lilly & Co. and/or its affiliates control and/or otherwise work in conjunction with Eli Lilly Export to set the prices at which Eli Lilly & Co's products, including insulin products, are sold to Puerto Rico residents, including Plaintiffs' beneficiaries. Eli Lilly directly coordinated with PBMs, including PBM Defendants, in setting benchmark prices for insulin to be sold in Puerto Rico. The actions of Eli Lilly & Co. and its affiliates are attributable to Eli Lilly Export and vice versa. Hereinafter, Defendants Eli Lilly Export and Eli Lilly & Co. are referred to collectively as "Eli Lilly".

26.     Defendant Novo Nordisk manufactures, promotes, and sells several analog insulin medications, including Novolin R, Novolin N, Novolog, Levemir, and Tresiba, all of which are provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the Plaintiffs for their beneficiaries. Each Plaintiff has purchased and/or paid for at least one of the analog insulin products manufactured by Novo Nordisk. Novo Nordisk employs sales representatives in Puerto Rico to promote and sell insulin products. Novo Nordisk also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico. Novo Nordisk is a Delaware corporation with its principal place of business in New Jersey. Novo Nordisk is registered to do business in Puerto Rico.

27.     Defendant Sanofi U.S. is a Delaware limited liability company with its principal place of business in New Jersey. Sanofi U.S. manufactures, promotes, and sells several analog

6

insulin products, including Lantus, Toujeo, Soliqua, and Apidra, all of which are provided to Puerto Rico residents and are, or have been, purchased and/or paid for by one or more of the Plaintiffs for their beneficiaries. Each of the Plaintiffs have purchased and/or paid for at least one of the analog insulin products manufactured by Sanofi U.S. Sanofi U.S. is a Delaware limited liability company with its principal place of business in New Jersey.

28.    Defendant Sanofi-PR is Defendant Sanofi U.S.'s affiliate in Puerto Rico and is a Puerto Rico corporation. Upon information and belief, Sanofi-PR and Sanofi U.S. operate as a single economic unit pursuant to which Sanofi U.S. and/or its affiliates control and/or otherwise work in conjunction with Sanofi-PR to set the prices at which Sanofi U.S.'s products, including insulin products, are sold to Puerto Rico residents, including Plaintiffs' beneficiaries. Sanofi-PR directly coordinated with PBMs, including PBM Defendants, in setting benchmark prices for insulin to be sold in Puerto Rico. The actions of Sanofi U.S. and its affiliates are attributable to Sanofi-PR and vice versa. Hereinafter, Sanofi U.S. and Sanofi-PR are collectively referred to herein as "Sanofi".

29.    Sanofi employs sales representatives in Puerto Rico to promote and sell Lantus, Toujeo, Soliqua, and Apidra. Sanofi also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics (like certain of Plaintiffs' beneficiaries) for the specific purpose of selling more insulin products in Puerto Rico.

30.    Defendant CareMarkPCS Health, L.L.C., is a Delaware limited liability company that maintains its principal place of business in Rhode Island. Defendant CareMark-PR is the affiliate of CareMarkPCS Health, L.L.C., in Puerto Rico. Defendant CareMark-PR is a Puerto Rico limited liability company. Upon information and belief, CareMarkPCS Health, L.L.C. and CareMark-PR operate as a single economic unit pursuant to which CareMarkPCS Health, L.L.C. and/or its affiliates control and/or otherwise work in conjunction with CareMark-PR to pressure the Manufacturing Defendants to provide higher rebates in exchange for favored placement on their formularies. Upon information and belief, Defendant CareMark-PR has itself negotiated with one or more of the Manufacturing Defendants to obtain rebates for favored status on the CareMark-PR formularies used for the sale of insulin products in Puerto Rico. Hereinafter, CareMarkPCS Health, L.L.C. and CareMark-PR are referred to collectively as "CVS CareMark".

31.    At all times relevant to this Complaint, CareMarkPCS Health, L.L.C. entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto

Rico and the placement of their drugs on CareMarkPCS Health, L.L.C.'s formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, and thus the amounts paid by Plaintiffs, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico.

32.     Defendant Express Scripts is a Delaware corporation that maintains its principal place of business in Missouri and is registered to do business in Puerto Rico. At all times relevant to this Complaint, Express Scripts entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto Rico and the placement of their drugs on Express Scripts' formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, and thus the amounts paid by Plaintiffs, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico.

33.     Defendant OptumRx is a California corporation that maintains its principal place of business in California and is registered to do business in Puerto Rico. At all times relevant to this Complaint, OptumRx entered into agreements with the Manufacturing Defendants related to rebates for their products sold in Puerto Rico and the placement of their drugs on OptumRx's formularies (which affected the availability and out-of-pocket contributions by Plaintiffs' beneficiaries in Puerto Rico, and thus the amounts paid by Plaintiffs, as set forth more fully herein) and provided other pharmacy benefit management services in Puerto Rico.

34.     Plaintiffs specifically disclaim any claims challenging the creation of custom formularies for a federal officer, such as for any Federal Employees Health Benefits Act or TRICARE governed health benefits plan. Furthermore, Plaintiffs specifically disclaim any claims seeking to recover moneys paid by the federal government pursuant to such plans as well as any claims seeking the recovery of federally mandated co-pays that were paid by such plans' patients. Thus, this Complaint does not seek relief from any Defendant that is governed by or available pursuant to any claim(s) involving a federal officer associated with any Federal Employees Health Benefits Act or TRICARE-governed health benefits plan.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over this case pursuant to, *inter alia*, 10 L.P.R.A. § 268, which confers jurisdiction on this Court to award the relief sought by the Plaintiffs, including threefold damages.

36. This Court has personal jurisdiction over Defendants in this matter pursuant to Puerto Rico Rules of Civil Procedure 3.1(a), 32 L.P.R.A. App. V, R 3.1(a) by transacting business in Puerto Rico and participating in unlawful acts within Puerto Rico.

37. Venue is proper in this Court pursuant to, *inter alia*, Puerto Rico Rules of Civil Procedure 3.4, 32 L.P.R.A. App. V, R. 3.4, because the cause of action or any part thereof originated in this venue.

## FACTUAL ALLEGATIONS

### I. The Prevalence and Treatment of Diabetes in Puerto Rico

38. Approximately 37 million people suffer from diabetes nationwide, including more than 430,000 people in Puerto Rico (approximately 20% of Puerto Rico's population).

39. Diabetes is a deadly disease. Left untreated, people with type 1 diabetes may suffer ketoacidosis, which can cause complications such as brain swelling, cardiac arrest, and kidney failure, while those with type 2 diabetes may suffer from heart disease, kidney disease, nerve damage, and other chronic conditions that could lead to premature death.

40. Regular injections of insulin effectively treat diabetes. The first insulins were extracted from animals more than 100 years ago. In the early 1980s, the first biosynthetic human insulin, known as Humalin, was licensed to Eli Lilly & Co. Novo Nordisk later launched another human insulin called Novolin. The development of these drugs led to a decline in the use of animal-derived insulins, which were later removed from the United States market. In the 1990s and early 2000s, researchers developed analog insulins, which are modified to account for the human body's natural pattern of insulin release. In the United States, the majority of patients use analog insulin—e.g., Humalog (Eli Lilly), Novolog (Novo Nordisk), Apidra (Sanofi), Lantus (Sanofi), and Levemir (Novo Nordisk)—rather than human insulin. As of 2018, analog insulins accounted for 91% of insulin volume and 92% of insulin sales in the United States. Upon information and belief, analog insulins account for similar volume and sales levels in Puerto Rico.

41. Insulin is also categorized based on how rapidly it takes effect and for how long it lasts. People suffering from diabetes typically take a combination of rapid-acting, short-acting, intermediate-acting, and long-acting insulins to control their glucose levels. For example, rapid-acting analogs may be used before mealtime to control spikes in blood sugar following the meal, while long-acting analogs may be used once or twice a day and overnight to help with glucose control.

42.     In helping patients manage their glucose levels, insulin treats diabetes and saves countless lives. However, over the past 25 years, the price of insulin has skyrocketed, leaving many patients unable to afford, or forced to underuse, this life-saving treatment.

43.     But it was not always this way. More than 100 years ago, when researchers developed animal-derived insulin injections to treat diabetes for the first time, those researchers famously assigned their patent rights in the drug to the University of Toronto for $1 each, so that "the method of preparation . . . would be free to prepare the extract" and that "no one could secure a profitable monopoly" over this life-sustaining drug. And for some time that was largely true. For example, up until 1999, one vial of Eli Lilly's Humalog listed for no more than $21 in the United States. As of 2019, that same vial cost more than $330, reflecting a price increase of more than 1000%.

44.     The troubling phenomenon of sky-rocketing insulin prices is unique to the United States. The most commonly used forms of analog insulin now cost 10 times more in the United States than in any other developed country. These astronomically high prices are no mistake:  they are the result of conscious, concerted activity by the Manufacturing Defendants and the PBM Defendants to exploit their respective and combined market power by raising prices to, and maintaining prices at, an artificially high level that guarantees sustained and otherwise-economically-unavailable profits for both groups of Defendants.

45.     Furthermore, as laid bare in March 2023, when Defendants nearly simultaneously reduced the prices of their insulin prices dramatically, the concerted actions of all Defendants have resulted in a massive fraud on all Puerto Ricans, including each of the Plaintiffs. Every time each of the Plaintiffs has paid the remaining balance of the price of the Manufacturing Defendants' insulin products (after Plaintiffs' beneficiaries have paid their respective co-pays or other cost-sharing responsibilities), Plaintiffs were informed of (and paid) a fraudulent price set by Defendants' actions and/or were the victims of a decision by Defendants to suppress the fact that the prices were excessively inflated through the Defendants' price-fixing actions.

**II.     The Supply Chain for Analog Insulin Drugs.**

46.     The supply chain for analog insulins in Puerto Rico is comprised of many different players, including manufacturers, wholesalers, pharmacies, PBMs, insurers, and IPAs, including Plaintiffs. The price paid by Plaintiffs is affected at each step of the chain.

47.     The Manufacturing Defendants sit at the top of the supply chain and together control approximately 95% of the market (both in the United States and, upon information and belief, in Puerto Rico specifically) for manufacturing analog insulin drugs. Drug manufacturers, including the Manufacturing Defendants, are solely responsible for determining the "wholesale acquisition cost" or "WAC" price for the drugs they manufacture. The WAC is also known as the "list price" or the "benchmark price."[1]

48.     Wholesalers purchase analog insulin drugs directly from the manufacturers, including the Manufacturing Defendants, at a negotiated discount from the WAC. Wholesalers then distribute those drugs to pharmacies, physicians, hospitals, and other customers.

49.     PBMs, including the PBM Defendants, administer prescription drug benefits on behalf of health insurers and other payers. In doing so, PBMs generate drug formularies (or lists) of prescription drugs covered by health plans that further provide the cost-share amounts that individual consumers must pay for their prescriptions. Typically, these drug formularies are divided into tiers, and drugs on the lower tiers have lower cost-share amounts. Manufacturers have strong financial incentive to gain placement on the PBM's drug formularies, because (among other reasons) placement on those formularies dictates whether the manufacturer's drug will be sold to the consuming public. Manufacturers have even more of an incentive to secure placement of their products on a lower tier, because the individual consumer's out-of-pocket contribution is lower for those products and consumers are accordingly more likely to want to buy those drugs.

50.     The financial incentives are especially strong with analog insulin. Despite being a product that has existed and been distributed for decades, the product is a huge revenue- and profit-driver for the Manufacturing Defendants. In 2016, Eli Lilly's revenues companywide from Humalog alone were $2.84 billion, Novo Nordisk's revenues from Novolog were $3.03 billion, and Sanofi's revenues from Lantus were $6.98 billion.

51.     PBMs' drug formularies (and especially those of the PBM Defendants) are thus critical to a huge portion of each of the Manufacturing Defendants' revenue streams: without placement on those formularies, the Manufacturing Defendants would be largely unable to sell their analog insulin to the consuming public.

---

[1] "Wholesale acquisition price," "WAC," "list price," and "benchmark price" are used interchangeably herein.

52.      In an attempt to garner favor with the various PBMs (including especially the PBM Defendants), the Manufacturing Defendants have derived a system pursuant to which they pay PBMs substantial "rebates" for their products when sold. These rebates are a *quid pro quo*: if a Manufacturing Defendant provides a good rebate to the PBM Defendant, the PBM Defendant will both place the Manufacturing Defendant's product on its drug formulary (thus opening access to pharmacies in general) and place the Manufacturing Defendant's product in a preferred tier on the drug formulary (thus increasing, through lower out-of-pocket contributions, the number of individual consumers who are likely to buy the particular analog insulin). This flow of funds (and the other payments and negotiations often associated with the insulin market) is depicted in overview form below. Although not specifically depicted in the below diagram,[2] and although a party to a slightly different flow of funds than in the diagram, the IPAs sit at the bottom of the flow of funds between the PBM Defendants and the Manufacturing Defendants: IPAs like Plaintiffs pay pharmacies for analog insulins at artificially high rates that have been set through the fraudulent, unlawful, and anticompetitive actions of Defendants.



53.      The PBMs (including in particular the PBM Defendants) are incentivized to participate in this drug-pricing scheme because of the additional revenues they receive from higher benchmark prices. The pricing employed by PBMs (including the PBM Defendants) is referred to as "spread pricing" and is a practice pursuant to which PBMs (like the PBM Defendants) retain a portion of the amount paid to them by health plans for drugs instead of passing the full amount to

---

[2] For the avoidance of doubt, IPAs are not "health plans" or any of the other labels depicted in the diagram.

the retail pharmacy at which the individual consumer filled his or her prescription. PBMs (including PBM Defendants) actually profit *more* if the benchmark price increases quickly, including (for example) because of the effect of "price-protection" rebates paid by manufacturers (including the Manufacturing Defendants) to PBMs (like the PBM Defendants). As described in one report on the drug industry as follows:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election. Price protection rebates between brand manufacturers and PBMs are more common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [benchmark price ] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'. Durable benchmark price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles.[3]

54. In other words, the result of this "price protection rebate arbitrage" is to create an incentive to continuously increase benchmark prices in order to increase the profits of PBMs (and the PBM Defendants, specifically) without diminishing the profits of drug manufacturers (and the Manufacturing Defendants, specifically). At the consumer and IPA level, however, the end result is simply a higher, artificially set price for a critical, life-saving product.

55. To that end, IPAs, including Plaintiffs, bear the ultimate economic burden with respect to the pricing of analog insulin: IPAs receive a set amount of funding per beneficiary for a set period of time (e.g., a sum certain for each fiscal quarter within a fiscal year) that is referred to as a capitation payment. The IPAs disburse funds from that capitation payment for services being provided for, or pharmaceuticals being purchased by, the IPAs' beneficiaries (i.e., the individual consumer). At the end of the set period of time (e.g., the end of a particular quarter), the IPAs, including Plaintiffs, either retain a portion of the remaining capitation-payment balance as profit, or they bear a portion of the overage on the capitation-payment balance as a loss. Importantly, the amount paid by the IPA (including Plaintiffs) is tied to the benchmark price; they

---

[3] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2016*, SSR (Oct. 5, 2016).

do not receive the benefit of any "price protection rebate arbitrage" or any other "rebates" received by the PBM. Thus, as it pertains to analog insulin, the artificially increased and created prices discussed herein have "squeezed" the margins associated with the IPAs' capitation payments: IPAs, including Plaintiffs, have received diminished profits, or have had to bear larger losses, because the prices for analog insulin paid by IPAs (including Plaintiffs) from the capitation payments are higher than would otherwise be the case in a competitive marketplace.

56.     Moreover, each time IPAs, including Plaintiffs, pay the artificially high prices for their beneficiaries' insulin products, they are victims of misrepresentation: both affirmative misrepresentations by the Manufacturing Defendants, which are misrepresenting that the prices they are charging as benchmark prices are being charged in good faith, legitimate, and the product of arm's-length negotiations, and suppression by all Defendants, who have concealed that the prices are artificially inflated as a result of their concerted conduct to raise and fix prices.

57.     Plaintiffs do not pass on any of the amounts they pay for the artificially priced insulin and instead bear those costs themselves. Each Plaintiff has accordingly incurred hundreds of thousands (and potentially millions) of dollars in damages from its purchase of each analog insulin product manufactured by the Manufacturing Defendants.

### III.     Each of the Manufacturing Defendants and the PBM Defendants dominate their respective markets and have wielded their market power to inflate prices.

58.     The Manufacturing Defendants and the PBM Defendants enjoy oligopolies in their respective markets, in which few sellers dominate and in which high barriers to entry render it difficult, if not impossible, for new sellers to enter.

59.     The Manufacturing Defendants have used their market power to fix prices for analog insulin horizontally, as set forth below, with each increasing their respective products' benchmark prices in lockstep pursuant to an express or implicit agreement.

60.     The PBM Defendants have similarly used their market power to fix prices—through rebates and other price controls set forth in their contracts and other agreements with drug manufacturers—by expressly or implicitly agreeing among themselves to increase the demanded amounts of rebates.

61.     The Manufacturing Defendants and PBM Defendants have also wielded their combined market power to agree, expressly or implicitly, to artificially increase prices that are passed on to end-purchasers, including Plaintiffs, who have no choice other than to pay the increased amounts.

14

a. **The Manufacturing Defendants dominate the market for analog insulin.**

62.     With respect to the Manufacturing Defendants, and to the extent necessary to Plaintiff's claims, the relevant product market is for analog insulin drugs, and the relevant geographic market is Puerto Rico.

63.     The market for analog insulin drugs is highly concentrated. The Manufacturing Defendants manufacture the majority of insulin sold in the United States and abroad. As of 2020, the Manufacturing Defendants' global market shares for insulin were as follows:

| Manufacturer | Global Market Share (by volume) | Global Market Share (by revenue) |
|---|---|---|
| Eli Lilly | 23% | 23% |
| Novo Nordisk | 52% | 41% |
| Sanofi | 17% | 32% |
| **Total** | **92%** | **96%** |

On information and belief, the Manufacturing Defendants dominate the market for insulin in Puerto Rico in similar fashion. Each of the Manufacturing Defendants accordingly wields substantial market power, and, combined, the Manufacturing Defendants function as an oligopoly that, when working together through an implicit or explicit agreement, are able to act as price-setters that can sustain above-competitive profit levels indefinitely.

64.     The market for analog insulin is insulated by high barriers to entry. Though the patents for the majority of analog insulins have expired or are about to expire, the Manufacturing Defendants continue to maintain patents for the pens and other devices that deliver insulin that are still in effect. The patent protection of these insulin devices serves as a *de facto* patent on the insulin drugs themselves. Each of the Manufacturing Defendants' pens and other delivery devices can be used with only that Manufacturing Defendants' brand of insulin. The lack of interoperability among devices and insulin delays competition in the analog insulin market and serves as a significant barrier to competitor entry.

65.     The Manufacturing Defendants readily recognize this and other high barriers to entry into the market for analog insulin: for example, in a statement from 2019, Eli Lilly asserted in pertinent part: "There aren't many insulin manufacturers because . . . manufacturing insulin is scientifically and technically very precise, difficult, and requires billions of dollars in long-term investments. Companies have to make a long-term commitment to be in this industry. Not many are able or willing to do so." The start-up costs to manufacture insulin, obtain FDA approval, and create largescale distribution networks (including by reaching agreements with, for example,

15

PBMs) are all significant barriers to entry that prevent new businesses from entering the competitive marketplace.

66.     Evidencing the difficulties faced by new entrants into the analog insulin market, though Viatris Inc. ("Viatris") and Biocon Biologics Ltd. ("Biocon") received FDA approval to manufacturer a biosimilar insulin in the United States, Viatris and Biocon have achieved only single-digit market share to date.

67.     Even more, demand for the Manufacturing Defendants' analog insulin drugs is highly inelastic because patients with diabetes require insulin to stay alive. This high price inelasticity allows Manufacturing Defendants to raise and maintain the price of the drugs substantially above marginal cost without losing so many sales as to make the price increase unprofitable. This, along with the high barriers to entry into the market for analog insulin drugs and the consolidation of market share among the Manufacturing Defendants, provides the Manufacturing Defendants with significant market power in the market for analog insulin drugs in Puerto Rico.

**b.  The Manufacturing Defendants have abused their market power and engaged in other anticompetitive conduct to artificially inflate the price of insulin.**

68.     Over the past twenty years, the Manufacturing Defendants have abused their market power to increase the list price of Manufacturing Defendants' analog insulins by more than 400%. The below chart reflects the increases from 2004 to 2022 of the "list" or "benchmark" price for four of the major analog insulin products (each of which is manufactured by one of the Manufacturing Defendants):



Analog insulin prices have steadily risen in US

Manufacturer price for 1000 IU insulin vial, sorted by year

Lantus — Humalog — Novalog — Levemir

Source: GlobalData Price Intelligence Database

69.     The Manufacturing Defendants' increases in the benchmark prices for analog insulins have proceeded in lockstep. For example, the below chart reflects that, from 2001, when

Novo Nordisk launched Novolog, its list price increased in tandem with that of Humalog, which is manufactured by Eli Lilly:



The same is true of Lantus, manufactured by Sanofi, and Levemir, beginning when Novo Nordisk launched the drug in 2006:



70.    Upon information and belief, the prices of Manufacturing Defendants' analog insulins in Puerto Rico have similarly increased in lockstep.

71.    The increases in the list price for Manufacturing Defendants' analog insulins have outmatched both inflation and the price of other consumer goods, in the United States as a whole (as depicted below) and, upon information and belief, in Puerto Rico in particular:



Price of Insulin vs. the Price of Other Goods

72.     In this way, the Manufacturing Defendants have artificially inflated and fixed list prices for their insulin products while maintaining profit margins. For example:

- Eli Lilly increased the WAC price for its rapid-acting insulin, Humalog 5050 Kwikpen, from $323 in 2013 to $530 in 2017—an increase of $207 (or 64%) in four years;

- Novo Nordisk increased the WAC price for its long-acting insulin pens, Levemir FlexTouch, from $303 in May 2014 to approximately $462 in January 2019—an increase of $159 (or 52%) in a little more than five years; and

- Sanofi increased the WAC price for its long-acting insulin pens, Lantus Solostar, from $303 in 2014 to $404 in 2019—an increase of $100 (over 33%) in 5 years.

73.     The increases in the benchmark price of analog insulins in the United States, which is mirrored in Puerto Rico, far exceed the cost to manufacture the drugs. According to some research, it costs roughly $2 to $4 to produce a vial of analog insulin—hundreds of times less than the average list price in the United States (and in Puerto Rico, specifically).

74.     Nor are the price increases justified by an increase in efficacy or other enhancement to the drugs, evidenced by the fact that the amounts spent by the Manufacturing Defendants on research and development are dwarfed by other line items in their budgets. For example, Eli Lilly reported spending $395 million on research-and-development costs for Humalog, Humulin, and Basaglar between 2014 and 2018, during which time the company spent nearly $1.5 billion on sales and marketing expenses for the drugs.

75.     In sum, the increases in benchmark price for the Manufacturing Defendants' analog insulins cannot be explained by research-and-development expenses, expenses to improve the efficacy of the drugs or their manufacture, or other justifiable reasons. These price increases

18

instead result from the Manufacturing Defendants' ability to control, and artificially inflate, the list prices of their analog insulins and their coordination with one another to maintain those excessively high prices, evidenced by: (a) the fact that no Manufacturing Defendant lowered the price of their brand-name analog insulins in response to the introduction of biosimilars and generic drugs into the market; (b) the inability of those biosimilars and generic drugs to meaningfully compete in the market; (c) the excessive gross margins on analog insulins that the Manufacturing Defendants have enjoyed for the past twenty years; and (d) perhaps most tellingly, a similarly coordinated decrease in the price of insulin in response to government actions and/or public pressure, all in March of 2023.

**c. The PBM Defendants dominate the market for PBM services.**

76.     With respect to the PBM Defendants, and to the extent necessary to Plaintiff's claims, the relevant product market is for PBM services (including especially the creation and administration of drug formularies), and the relevant geographic market is Puerto Rico.

77.     Unique to the United States, PBMs, including the PBM Defendants, are administrators hired by third-party payers, such as government entities or insurers, to design and administer prescription drug programs. In doing so, the PBM Defendants compile "drug formularies" setting out the prescription drugs covered by insurance plans and the co-payments and other cost-sharing amounts borne by consumers under those plans. PBMs also maintain a network of pharmacies where beneficiaries can fill prescriptions and negotiate and process payments to pharmacies for the drugs dispensed.

78.     The PBM Defendants dominate the PBM market in the United States. The PBM Defendants' market shares in the United States were recently calculated as follows:

| PBM | Percentage of Claims Administered | Percentage of U.S. Population Covered |
|---|---|---|
| CVS Caremark | 34% | 32% |
| Express Scripts | 24% | 24% |
| OptumRx | 21% | 20% |
| **Total** | **79%** | **76%** |

On information and belief, the PBM Defendants dominate the market for drug benefits in Puerto Rico in similar fashion.

79.     The PBM market was not always so consolidated. As recently as 2000, there were more than 40 PBMs operating in the United States. After merging with or acquiring their competitors, the PBM Defendants have cannibalized the PBM market and now control 80% of prescriptions for more than 270 million Americans:



80.  Among other things, the consolidation of the market—and the corresponding consolidation of potential clients and contracts—as well as pharmacy networks and various network effects have led to significant barriers to entry for any potential competitors. The PBMs (including especially the PBM Defendants) rely on their significant number of beneficiaries and clients to assert leverage in their negotiations with Manufacturing Defendants, and it is difficult (if not impossible) for a start-up PBM to compete with the established PBMs (including especially the PBM Defendants). Thus, the PBM Defendants, like the Manufacturing Defendants, are oligopolistic firms with substantial market power that can accordingly artificially set prices (here, in the form of demanded rebates) for an extended period of time without concern for new competition or decreased sales or profits.

**d. The PBM Defendants have abused their market power and engaged in other anticompetitive conduct to artificially inflate the price of insulin.**

81.  The PBM Defendants generate profits in two ways: (1) service and administrative fees; and (2) rebates for each sale of a drug listed on the PBM Defendants' formularies, paid by the drug's manufacturer and equal to a percentage of the drug's WAC. Prescription drug rebates are reductions from the WAC (or list) price redeemed from manufacturers after the transaction. Yet, unlike traditional rebates, manufacturers pay prescription drug rebates to the PBM Defendants, not to the parties (i.e., Plaintiffs) who paid the WAC price (or a price closely associated with the WAC price).

82.  By virtue of the PBM Defendants' dominance in the PBM market, inclusion of a prescription drug on the PBM Defendants' drug formularies is critical to drive the volume and

20

number of sales of that drug. As Eli Lilly explained to its investors in 2019, exclusion from a PBM Defendant's formulary can "lead to reduced usage of a drug for the relevant patient population due to coverage restrictions, such as prior authorizations and formulary exclusions, or due to preferred co-pay tiers, increased co-insurance levels, and higher deductibles."

83. But it need not be that way. Where (1) two or more drug companies manufacture drugs in the same therapeutic class, with similar effectiveness and risk profiles, and (2) the cost of manufacturing the drug is low—both of which conditions apply with respect to the Manufacturing Defendants' analog insulins—the rebates provide leverage to the PBM Defendants to negotiate lower prices for consumers. The PBM Defendants could require that the manufacturers compete for access to their formularies by lowering the WACs for their drugs, but they do not.

84. Instead, the PBM Defendants negotiate higher and higher rebates from manufacturers. Indeed, smaller rival PBMs with nominal market shares and little-to-no bargaining power are offered less generous rebates, discounts, and other fees by manufacturers compared to the PBM Defendants. For example, an internal Sanofi memo documents rebate negotiations with WellDyneRX, a small competitor of the PBM Defendants, for some of Sanofi's analog insulin drugs. Noting that WellDyneRX "is a PBM with ~ 1M lives," (compared to, for example approximately 16 million lives covered by Defendant CVS Caremark at the time), Sanofi offered WellDyneRX rebates ranging between 40% and 50% for the drugs, while offering CVS Caremark rebates up to 72%.

85. The PBM Defendants also *exclude* drugs from their formularies in order to procure high rebates from manufacturers. Defendants CVS Caremark, Express Scripts and OptumRx began excluding drugs from their formularies in 2012, 2014, and 2016, respectively. In that time, insulins have been one of the PBM Defendants' most frequently excluded drugs:

**Figure 5.** Number of insulins excluded from 1 or more formulary, by year and PBM



86.     The PBM Defendants purport that these exclusions serve to control costs, by excluding higher-cost drugs in place of lower-cost alternatives. The opposite is true. Manufacturers typically offer rebates only for branded drugs, not generics. Typically, branded drugs account for a small percentage of drug utilization but the vast majority of drug spending. For example, for Plan Vital (the Puerto Rico government health plan), the branded drug utilization rate is less than 10%, but branded drugs account for approximately 80% of drug spending.

87.     Two out of every three biosimilar[4] products are excluded by one of the PBM Defendants, as are many generic insulins[5] that are less expensive than their brand-name equivalents. And these exclusions are not evidence-based, as often a product or prescription drug will be preferred on one PBM Defendant's formulary but excluded on another's.

88.     With their market power, combined with their exclusionary practices, the PBM Defendants have reaped unprecedented profits, as the rebates paid by drug manufacturers to the PBM Defendants have more than doubled over the past decade.[6] The proceeds from those rebates, along with attendant fees, have skyrocketed, totaling more than $27.5 billion in profits for the PBM Defendants in the last year, alone – a 483% increase over the past decade.

89.     By indirectly driving up the WACs of analog insulin through their rebate scheme, the PBM Defendants' practices have increased the costs of those drugs—including the Manufacturing Defendants' analog insulins—to Plaintiffs. As this chart depicts, for prescription drugs sold from 2016 to 2018, on average, a $1 increase in rebates was associated with a $1.17 increase in the WAC price.

---

[4] A biosimilar is an FDA-approved biologic that is highly similar to, and has no clinically meaningful difference from, another biologic that is already FDA-approved (referred to as the reference product or original biologic). Biosimilars are generally lower priced than their existing biologic counterparts.

[5] An authorized generic medicine is a brand name drug that is marketed without the brand name on its label. Even though the authorized generic is the same brand name product, a company may choose to sell the authorized generic at a lower cost than the brand name drug.

[6] For example, Sanofi increased its rebates from 2-4% in 2013 to 56% in 2018.



90.     The PBMs have effectively exploited their market power to demand higher rebates from the Manufacturing Defendants, which in turn use their market power to pass the rebate amounts on to the ultimate payors, including (as pertinent here) IPAs such as Plaintiffs.

## IV.     The Manufacturing Defendants and the PBM Defendants coordinate to further artificially inflate analog insulin prices.

91.     For more than a decade, the Manufacturing Defendants and the PBM Defendants have agreed, either explicitly or implicitly, to steadily increase the WAC for the Manufacturing Defendants, in turn increasing the rebates to the PBM Defendants. More specifically, the PBM Defendants and the Manufacturing Defendants have agreed to increase their profits by putting analog insulin products on their formularies that have the highest WACs and the most generous rebates to the PBM Defendants.

92.     This pricing scheme (the "Insulin Pricing Scheme") is built into the contracts between the Manufacturing Defendants and the PBM Defendants. Though the rebates that the PBM Defendants negotiate are highly confidential and the exact terms of the agreements between PBMs and prescription drug manufacturers are reportedly unknown to others in the supply chain, it is now established that the contracts provide "price protection," triggering additional rebate payments to the PBM Defendants whenever a Manufacturing Defendant raises the WAC beyond a certain amount.

93.     Even more, the PBM Defendants are aware of their oligopolistic power, the prevalence of rebates in the industry, the lockstep increases in the Manufacturing WACs, and the increased profits experienced by each of the PBM Defendants. Even if the PBM Defendants are not aware of each other's rebates (or increasing their own rebates to match the other PBM Defendants'

23

rebates) dollar for dollar, they are aware of (and are agreeing, implicitly or expressly, to) the general range of increased prices and rebates.[7]

94.     The Defendants have coordinated through other channels, as well. For example, each Manufacturer Defendant is a member (individually or through an affiliate) of the industry-funded Pharmaceutical Research and Manufacturers of America ("PhRMA"). Executives from each of the Manufacturing Defendants (or their affiliate) sit, and have sat for many years, on PhRMA's board of directors. Currently, David Ricks, the Chairman and CEO of Eli Lilly & Co.; Paul Hudson, the CEO of Sanofi U.S.; and Douglas Langa, the President of Novo Nordisk, serve on the PhRMA board. The Manufacturing Defendants are believed to have routinely communicated through PhRMA meetings in furtherance of their artificial inflation of analog insulin WACs, through their lockstep price increases and the Insulin Pricing Scheme.

95.     The PBM Defendants, too, are members (either individually or through affiliates) of an industry-funded trade organization, the Pharmaceutical Care Management Association ("PCMA"), which holds several yearly conferences, annual meetings, and business forums. Executives from each of the PBM Defendants (individually or through an affiliate) sit, and have sat for many years, on PCMA's board. Currently, the PCMA board is comprised of, among other executives in the industry, Adam Kautzner, the President of Express Scripts; David Joyner, an Executive Vice President at CVS Health, which, upon information and belief, operates CareMarkPCS Health, L.L.C.; and Heather Cianfrocco, the CEO of OptumRx. The PBM Defendants are believed to have routinely communicated through PCMA meetings in furtherance of their artificial inflation of analog insulin WACs, through their rebates and the Insulin Pricing Scheme.

96.     The Manufacturer Defendants (either individually or through affiliates) are affiliate members of the PCMA and, for at least the last eight years, have been "Partners," "Platinum Sponsors," or "Presidential Sponsors," of PCMA conferences. The conference portrays "private meetings" between its members—and especially executives from manufacturers like the Manufacturing Defendants and from PBMs like the PBM Defendants—for the purpose of "conduct[ing] onsite business meetings" as "a core value" of the conference.

---

[7] The nature of this price-fixing is perhaps most aptly illustrated by the fact that the PBM Defendants reportedly exist to negotiate *decreased* prices for drugs. If any of the PBM Defendants had operated as they were created to operate, they would have used their leverage to effect lower prices for drugs; rather, they have each, through implicit or express agreement with the others, insisted on higher rebates, which increase their profits at the expense of their beneficiaries.

97.     PCMA also hosts PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." The Manufacturing Defendants and the PBM Defendants are believed to have used PCMA-Connect and conference meetings to facilitate the exchange of information and otherwise reach agreements in furtherance of the Insulin Pricing Scheme.

98.     The Manufacturing Defendants and the PBM Defendants are believed to regularly communicate by way of PhRMA and PCMA platforms and meetings in furtherance of the Insulin Pricing Scheme, evidenced by the timing of the Manufacturing Defendants lockstep price increases.

99.     For example, on September 26 and 27, 2017, the PCMA held its annual meeting, and each of the Manufacturing Defendants hosted private meeting rooms. Executives from each Defendant are believed to have engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.

100.     Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus. This price increase occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C., which was attended by representatives from all Defendants.

101.     The Manufacturing Defendants' internal documents further confirm their coordination with the PBM Defendants in furtherance of the Insulin Pricing Scheme. For example, in an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.

102.     Consistent with this evidence, and upon information and belief, the Insulin Pricing Scheme is a coordinated effort between the Manufacturing Defendants and the PBM Defendants. The Manufacturing Defendants and the PBM Defendants are believed to be in frequent communication and regularly meet and exchange information to construct and refine the PBM Defendants' formularies that form and fuel the scheme. As part of these communications, the Manufacturing Defendants are believed to be directly involved in determining not only where their

own analog insulin products are placed on the PBM Defendants' formularies, but also in the placement and treatment of the analog insulin products manufactured by other insulin manufacturers.

103.     For the past decade, the Defendants' Insulin Pricing Scheme has succeeded, as the Manufacturing Defendants have raised prices in unison and have paid correspondingly larger rebate payments to the PBM Defendants. In exchange for the Manufacturing Defendants' artificially inflating their prices and paying the PBM Defendants substantial amounts in rebate payments, the PBM Defendants grant the Manufacturing Defendants' analog insulin products preferred status on their formularies. During the relevant period, the rebate amounts paid to the PBM Defendants (as a proportion of the WACs) and the WACs set by the Manufacturing Defendants for their analog insulins increased in tandem.

104.     The end result of these unlawful combinations or agreements in restraint of trade, including horizontal price-fixing (between the Manufacturing Defendants, as to their WACs, and between the PBM Defendants, as to their rebates) and vertical price-fixing (between the PBM Defendants and Manufacturing Defendants), is to create an artificially high WAC that is borne by the Plaintiffs.

105.     Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) have caused and continue to cause artificial prices for the at-issue drugs. Plaintiffs have been overcharged, and sustained significant damages in paying for, Manufacturing Defendants' analog insulin drugs.

**V.      Defendants have all but admitted they have deceived the public regarding the insulin pricing scheme—a fact that was revealed in March 2023.**

106.     Defendants have touted in the media and testified before Congress knowledge that the prices of analog insulin are too high, all the while purporting to lament the exorbitant prices and claiming that Defendants have no ability to lower those prices.

107.     In 2019, for example, before the U.S. House Energy and Commerce Committee at a meeting titled "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin," Defendants testified as follows.

108.     Mike Mason, Senior Vice President of Defendant Eli Lilly & Co., testified that "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications...." Recognizing that

"Insulin [is] literally life-saving," Mr. Mason nonetheless testified, "Unfortunately, this affordability challenge cannot be addressed simply by lowering list prices."

109. Douglas Langa, President of Defendant Novo Nordisk, testified, "we do know that more patients are facing an affordability challenge" and that "the number of patients struggling to afford their medicines has grown in recent years." Mr. Langa represented that these price increases were beyond Novo Nordisk's control, testifying that "WAC price is set against the backdrop of the competitive environment in which we operate" and blaming the "pressures that exist in the U.S. healthcare system around the pricing of insulin medications, including how changes in benefit designs and the increasing commonality of high-deductible health plans have contributed to rising out-of-pocket costs for prescription medicines." Mr. Langa further testified:

> Unfortunately, as a pharmaceutical company, we do not have the ability to control what an individual insured patient pays for his or her prescriptions; that is a function of the individual's health plan design. Similarly, we do not have control over whether the rebates we pay to ensure formulary access actually result in lower out-of-pocket costs for patients; that is the decision of the PBM, which determines how to apply the rebate.... [T]he number of patients struggling to afford their medicines has grown in recent years. This is due, in part, to the increasing prevalence of benefit designs that require patients to shoulder large out-of-pocket costs, such as high-deductible health plans.... As we became aware that more patients were struggling to afford their medicines, we took steps to try to address the problem, including our commitment in 2016 to limit WAC price increases to single digit percentages annually.

110. Kathleen Tregoning, Executive Vice President of Defendant Sanofi U.S., testified, "Patients are rightfully angry about rising out-of-pocket costs for many medicines and we all have a responsibility to address a system that is clearly failing too many people...we recognize the need to address the very real challenges of affordability...." Ms. Tregoning testified that these "affordability challenges" are not the result of Sanofi U.S.'s "set[ting] prices as we do," claiming instead that, "[i]n some cases, affordability issues are the result of changes in health plan designs, such as the increase in the number of high deductible health plans" and "[i]n other cases, affordability issues are caused by changes in insurance design, which increasingly require patients to pay higher cost-sharing amounts for their medicines, even when the pries of those medicines have stayed relatively flat or declined for the health plan," ignoring that the price of insulin has only steadily, and astronomically, increased over the past decades.

111. As this testimony demonstrates, the Manufacturing Defendants have long known that their artificially inflated prices for analog insulins cause harm to consumers and payors, Plaintiffs, included. But rather than account for the harm caused by their price-fixing and other anticompetitive conduct, the Manufacturing Defendants instead sought to obscure their

misconduct by suggesting that their price increases are in good faith and/or beyond their control through these and other misrepresentations.

112.    The PBM Defendants are no different. At that same congressional hearing, Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans." Mr. Moriarty swore at that hearing that CVS Health "negotiate[s] the best possible discounts off the manufacturer's price on behalf of employers, unions, government programs, and the beneficiaries [CVS Health] serve[s]." Mr. Moriarty insisted that increases in insulin prices are the result not of any action taken by CVS Health, but instead result from the fact that "unlike most other therapeutic classes, until recently, there have been no generic alternatives [to insulin] available."

113.    Amy Bricker, Senior Vice President, Supply Chain, for Express Scripts testified, "over seven million Americans diagnosed with diabetes use insulin.... People with Diabetes in the U.S. pay between 5.7 times and 7.5 times more than those in the UK for their insulin. For some patients, the increasing price of insulin limits access and adherence." Ms. Bricker represented that "Express Scripts' innovative pharmaceutical and pharmacy solutions position [Express Scripts] to offer even greater value to our clients, public health program partners, and patients," elaborating that "Express Scripts uses clinical expertise and scale to negotiate lower drug costs with drug manufacturers, leveraging competition to help drive savings for clients, which include employers, labor unions, health plans, the federal government, and states," which "ultimately benefit patients in the form of lower premiums and reduced out-of-pocket costs." Ms. Bricker insisted, "[r]ebates are not the cause of increasing drug prices[,] rebates are used to reduce health care costs for consumers." All told, Ms. Bricker assured, "[w]hen it comes to prescription drugs, our goal is to achieve improved clinical outcomes at lower costs" and "we are working every day to lower the cost of this life-saving medication [insulin] for the patients we serve."

114.    Dr. Sumit Dutta, Chief Medical Officer of OptumRx testified, "the price of insulin remains too high" and price increases "have a real impact on consumers in the form of higher out-of-pocket costs." In the face of these price increases, Dr. Dutta represented that "OptumRx delivers value for our customers and the customers we serve through a number of services, including lowering drug costs," discounts which "[h]istorically, our customers have used ... to reduce the costs of drugs, help keep premiums stable and help ensure access to drugs for consumers." Dr.

Dutta assured that OptumRx has "heeded the call for change by taking direct action to ensure that the discounts we obtain directly lower consumer's out-of-pocket costs at the pharmacy counter."

115. The PBM Defendants repeat these misrepresentations on their websites and in the media. For example, Defendant CVS Caremark claims that it, like other PBMs, "reduce[s] prescription drug costs" and that it, like other PBMs, "work[s] hard to keep prices down because [it] know[s] that people who take their medications as prescribed have better outcomes and lower health costs. In its 2017 Drug Report, CVS Caremark touted its objective to ensure "that the cost of a drug is aligned with the value it delivers in terms of patient outcomes...[and], in 2018, [CVS Caremark is] doing even more to help keep drugs affordable." CVS Caremark has detailed further publicly detailed its purported efforts to control drug prices as follows:

    a. "MYTH: Rebates negotiated by PBMs are driving up the prices of prescription drugs for consumers and plan sponsorship. FACT: Pharmaceutical manufacturers set the list price for a given drug. PBMs then negotiate with manufacturers to secure the drug at a lower cost for their plan sponsors and their members."

    b. "MYTH: PBMs increase cost-sharing burdens for beneficiaries. FACT: Plan designs are determined by clients – employers and health plans – who decide how they subsidize their members' coverage."

    c. "MYTH: PBMs lower drug costs by restricting patient access to needed medication. FACT: PBMs help ensure that beneficiaries have access to the prescriptions they need to stay healthy, at a price they can afford."

    d. "As a PBM and an Employer, We Know Rebates and Innovation Lower Drug Costs"; and

    e. Making sure you have access to affordable medication and convenient options for filling is our priority.

116. Defendant Express Scripts, for its part, published a press release on August 31, 2016 stating "Diabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payers....[Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease" and "broaden[s] insulin options for patients [to] bend down the cost curve of what is currently the costliest class of traditional prescription drugs. Express Scripts has further publicly detailed its efforts to "bend down the cost curve" of insulin as follows:

29

a. Express Scripts "works with plan sponsors to provide a benefit that delivers the best clinical outcome and the lowest possible cost."

b. "PBMs provide better care and lower cost with every prescription, every time."

c. "Rebates do not raise drug prices, drug makers raise drug prices, and they alone can lower them. Consider the cost of Humalog® (insulin lispro): over the past seven years, the list price for this medication has increased dramatically, yet the net cost has remained relativity constant. Without PBMs, and specifically without Express Scripts, plan sponsors would have paid exponentially more for their prescription drugs."

d. "We ... negotiate with drug manufacturers so no one pays more than they need to."

e. "FACT: Public disclosure of negotiated rebates will not lower prescription drug costs. #PBMs Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."

117. Defendant OptumRx similarly claims that "Rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drug costs for clients" and testified before Congress that "OptumRx's pharmacy care service business is achieving better health outcomes for patients, lowering costs for the system, and improving the health care experience for consumers." OptumRx has further publicly detailed its efforts to "lower[] costs for thesystem" as follows:

a. "PBMs develop pharmacy networks, negotiate with drug companies for the best medication prices, process pharmacy claims, and may operate a home delivery pharmacy."

b. "[W]e make the consumer experience a top priority to create better outcomes, lower costs, and improve the overall healthcare system."

c. "[We help] millions of people get medication safely, conveniently and at the best price."

d. "We strive to contain medication costs and our clinical programs are designed to provide better care and outcomes."

118. Like the Manufacturing Defendants, the PBM Defendants have long known that their artificially inflated prices for analog insulins cause harm to consumers and payors, including Plaintiffs. The PBM Defendants repeatedly represented to Congress and to the public that their

conduct, including their rebate scheme, has no effect in raising insulin prices, representing instead that insulin price increases are the result of other market forces. But as alleged herein, that is simply not true.

119. Public statements by both the Manufacturing Defendants and the PBM Defendants conceal their price-fixing and other anticompetitive conduct, as alleged herein, insisting instead that insulin prices are the product of healthy competition and market forces, as well as the result of arm's-length, good faith, or legitimate negotiations. That, too, is untrue. But Defendants never remedied these misrepresentations—either by way of correcting earlier misstatements or supplementing incomplete statements with the full truth.

120. Plaintiffs now know that (1) the Defendants' anticompetitive conduct alleged herein did not, and does not, work to lower insulin prices; (2) the "affordability challenges" for analog insulin referenced by Defendants before Congress and to the public are well within the Defendants' control and, indeed, challenges of their own making; and (3) rather than exert that control to lower insulin prices as the Defendants represented they would do, the Defendants instead astronomically, and without justification, increased those prices through their price-fixing, rebate schemes, and other anticompetitive conduct, conduct that Defendants worked to conceal through the misrepresentations summarized herein.

121. For decades, Defendants succeeded in concealing their fraudulent price-fixing scheme and other misconduct by way of the misrepresentations summarized herein. In March 2023, within a two-week period, the Manufacturing Defendants slashed analog insulin prices by nearly 80%, though the costs to develop, manufacture, and market the drugs had not changed to trigger, or otherwise explain, the price decreases. Such dramatic price cuts—price cuts after which Defendants will still profit hugely from the manufacture and sale of insulin in the United States— were possible only because the prices of analog insulins were so exorbitantly, and artificially, inflated by Defendants' price-fixing and other unlawful conduct.

122. Defendants' price decreases are overdue and insufficient, as they have looted billions of dollars from consumers and payors, Plaintiffs included, by way of their price fixing scheme and other unlawful conduct. Plaintiffs seek to recover damages for the harm suffered as a result of that misconduct.

## COUNT ONE
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258
## BY THE MANUFACTURING DEFENDANTS

123.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

124.    The Manufacturing Defendants' conduct violates Section 258 of the PRAA, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico." 10 L.P.R.A. § 258.

125.    The Manufacturing Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or combinations to artificially increase in lockstep the WAC for their respective brand-name analog insulins.

126.    These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiffs. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

127.    Plaintiffs have been harmed by the Manufacturing Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to suffer, damages, including but not limited to increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

128.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to their businesses caused by the Manufacturing Defendants' anti-competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT TWO
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258
## BY THE PBM DEFENDANTS

129.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

130.    The PBM Defendants' conduct also violates Section 258 of the PRAA.

131.    The PBM Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or

32

combinations to set rebates (and thus, ultimately, the WACs) for the Manufacturing Defendants' analog insulin products.

132.    These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiffs. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

133.    Plaintiffs have been harmed by the PBM Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to suffer, damages, including but not limited to increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

134.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to their businesses caused by the PBM Defendants' anti-competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT THREE
## UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF PRAA § 258
## BY THE MANUFACTURING DEFENDANTS AND THE PBM DEFENDANTS

135.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

136.    Combined, the Manufacturing Defendants and the PBM Defendants' conduct violates Section 258 of the PRAA.

137.    The Manufacturing Defendants and the PBM Defendants have entered into agreements and/or combinations that unreasonably restrict competition in the analog insulin market, including the agreements and/or combinations in furtherance of the Insulin Pricing Scheme.

138.    These agreements have substantial anti-competitive effects, including increased prices and costs to Plaintiff. These agreements serve no legitimate or pro-competitive purpose that could justify their anticompetitive effects, and thus unreasonably restrain and substantially foreclose competition in the analog insulin market.

139.    Plaintiffs have been harmed by the Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered, and continue to

suffer damages, including, but not limited to, increased costs for the provision of analog insulin and related treatment to patients in Puerto Rico.

140.    Under 10 L.P.R.A. § 268, Plaintiffs have standing to and do hereby seek monetary relief—including treble damages—for harm to its business caused by the Defendants' anti-competitive conduct, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

**COUNT FOUR:**
**NEGLIGENT AND/OR INTENTIONAL MISREPRESENTATION**

141.    Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

142.    Each time one of Plaintiffs' beneficiaries purchases (and has purchased) analog insulin from a pharmacy, the pharmacy from which the insulin is procured quotes the WAC (or an amount related to, and based on, the WAC) as the price for the insulin.

143.    The beneficiaries pay the required co-pay and/or other cost-sharing obligation, and the remainder of the quote price is paid by the IPAs.

144.    The quoted price is based on a misrepresentation: both an affirmative misrepresentation by the pertinent Manufacturing Defendant of the particular WAC at the time the insulin is purchased, and a misrepresentation by suppression by each of the Defendants, who are representing that their involvement in the process for setting the WAC is the result of arm's-length, good faith, and legitimate negotiations is not the product of an anticompetitive conspiracy to raise and fix prices for insulin.

145.    Defendants were under a duty to disclose their less-than-arm's-length relationship and their unlawful, concerted actions to artificially raise and fix the prices of insulin.

146.    Defendants had sole access to material facts concerning the fraudulent and/or misrepresented nature of the prices quoted and charged for insulin products in Puerto Rico.

147.    The Manufacturing Defendants and PBM Defendants worked together to perpetrate the foregoing misrepresentations as to the price of insulin on the general public, including Plaintiffs, their beneficiaries, pharmacies, and other medical providers in Puerto Rico.

148.    The Manufacturing Defendants affirmatively misrepresented the WAC and/or quoted price in selling their respective products in Puerto Rico, and both the Manufacturing Defendants and the PBM Defendants suppressed that the WAC and/or quoted price was the result of unlawful, less-than-arm's-length negotiations.

149.     Plaintiffs first learned or had reason to know of the Defendants' misrepresentations in March 2023, when each of the Manufacturing Defendants lowered—within a two-week period—their prices for insulin products by hundreds of dollars.

150.     The aforementioned misrepresentations are made in the course of each Defendant's business activities (i.e., with respect to the Manufacturing Defendants, the manufacturing, marketing, and sale of insulin in Puerto Rico, and with respect to the PBM Defendants, the collection of rebates for placement of the insulin products on their formularies).

151.     The aforementioned misrepresentations are made intentionally and/or negligently. Each Defendant either intended to deceive individual consumers and their payors (including Plaintiffs) into believing the quoted prices were legitimate, or they were negligent in leading consumers and their payors (including Plaintiffs) to believe the quoted prices were legitimate.

152.     Plaintiffs are entitled to recover all resulting damages from Defendants' misrepresentations, as well as costs of this proceeding and pre- and post-judgment interest.

## COUNT FIVE
## NEGLIGENCE/CLAIMS UNDER ARTICLE 1536

153.     Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

154.     Article 1536 provides for a cause of action resulting from a defendant's negligent act.

155.     To prevail on a negligence claim, Plaintiffs must establish (1) an injury, (2) a breach of duty, and (3) proximate causation of the injury.

156.     Generally, duty is defined by the general rule that one must act as would a prudent person under the circumstances.

157.     Puerto Rico law presumes that every man owes to his fellow creatures that degree of care and vigilance as will enable him to enjoy his life with safety.

158.     Here, all Defendants owed a duty of care to Plaintiffs: among other things, Manufacturing Defendants owed a duty to quote a reasonable, legitimate, and non-fraudulent price for its insulin products (and/or to disclose that the quoted price was the product of less-than-arm's-length, fraudulent, and bad-faith negotiations), and the PBM Defendants owed a duty to disclose their combined action with Manufacturing Defendants to artificially raise insulin prices.

159.     The Manufacturing Defendants and PBM Defendants worked together to perpetrate the foregoing misrepresentations and other tortious conduct with respect to the price of insulin on

the general public, including Plaintiffs, their beneficiaries, pharmacies, and other medical providers in Puerto Rico.

160. The Manufacturing Defendants affirmatively misrepresented, and otherwise acted tortiously in connection with, the WAC and/or quoted price in selling their respective products in Puerto Rico, and both the Manufacturing Defendants and the PBM Defendants suppressed, and otherwise acted tortiously with respect to, the fact that the WAC and/or quoted price was the result of unlawful, less-than-arm's-length negotiations.

161. Plaintiffs have suffered an injury: the PBM Defendants and Manufacturing Defendants' actions have resulted in artificially high insulin prices that have been quoted to Plaintiffs' beneficiaries and paid (in large part) by Plaintiffs.

162. Defendants' breaches caused Plaintiffs' injuries: the Manufacturing Defendants' failure to quote reasonable and legitimate prices, and all Defendants' failure to disclose their less-than-arm's-length relationship, resulted in the artificially high prices charged by Defendants.

163. Plaintiffs thus seek and are entitled to recover all damages resulting from Defendants' negligence.

## COUNT SIX
## BAD FAITH

164. Plaintiffs incorporate each of the foregoing allegations as though set forth in full herein.

165. Pursuant to Article 15 of the Civil Code, "[l]os derechos deben ejercitarse y los deberes deben cumplirse conforme con las exigencias de la buena fe." Moreover, Article 18 provides "[l]a ley no ampara el abuso del derecho ni su ejercicio contrario al orden social. Todo acto u omisión que exceda manifiestamente los límites normales del ejercicio de un derecho, que ocasione daño a tercero, ya sea por la intención de su autor, por su objeto o por las circunstancias en que se realice, da lugar al correspondiente resarcimiento y a la adopción de medidas cautelares."

166. Similarly, as explained by the Supreme Court of Puerto Rico, "el requisito de la buena fe es también exigencia general de nuestro derecho y que como tal se extiende a la totalidad de nuestro ordenamiento jurídico." *See Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585, 587-88 (P.R. 1981).

167. Further Article 265 provides "[l]os hechos y los actos jurídicos voluntarios e involuntarios producen los efectos que la ley les atribuye."

36

168.  As set forth above, the Manufacturing Defendants and PBM Defendants have undertaken certain juridical acts in bad faith, and those juridical acts have resulted in damages to Plaintiffs. Plaintiffs are thus entitled to recover all resulting damages from those bad-faith actions, pursuant to, *inter alia*, Civil Code article 18.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that, after due proceedings are had, the Court issue an Order:

A.  Declare Defendants' conduct as described herein above to be in violation of the PRAA;

B.  Permanently enjoin Defendants and all other persons acting on their behalf, directly or indirectly, from violating the PRAA;

C.  Enter judgment directing Defendants to pay all damages and other remedies to Plaintiffs as a result of the acts and practices alleged in this Complaint and any other acts or practices proved by the Plaintiffs pursuant to 10 L.P.R.A. § 268 and other provisions of Puerto Rico law;

D.  Direct Defendants to pay the Plaintiffs' litigation costs in this matter pursuant to, *inter alia*, 10 L.P.R.A. § 268; and

E.  Award any and all other relief as may be just and equitable.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 5th day of September 2023.

Respectfully submitted,

*/s/ Harold D. Vicente-Colón*
Harold D. Vicente-Colón
RUA 11303

*/s/ Harold D. Vicente-Gonzalez*
Harold D. Vicente Gonzalez
RUA 3966
Vicente & Cuebas
Capital Center Sur Ph1-1201
239 Arterial Hostos
Hato Rey
Tel. (787) 751-8000
hdvc@vclawpr.com

/s/Heriberto López Guzmán
RUA 16166
H. Lopez Law, L.L.C.
Metro Office Park
Lot 11, Suite 105A
Guaynabo, Puerto Rico 00968
Tel: (787) 422-0243
hlopez@hlopezlaw.com

37

Jason W. Burge (to be admitted *pro hac vice*)
Michael R. Dodson (to be admitted *pro hac vice*)
C. Hogan Paschal (to be admitted *pro hac vice*)
FISHMAN HAYGOOD, LLP
201 St. Charles, 46th Floor
New Orleans, LA 70170
Telephone: (504) 585-5252
Facsimile: (504) 586-5250
jburge@fishmanhaygood.com
mdodson@fishmanhaygood.com
hpaschal@fishmanhaygood.com

*Counsel for Plaintiffs*

38